**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| KYLE LEE OWENS,<br><br>Plaintiff,<br><br>vs.<br><br>THOMAS BENEKE and IOWA CENTRAL COMMUNITY COLLEGE,<br><br>Defendants. | No. C26-3002-LTS<br><br>**MEMORANDUM OPINION AND INITIAL REVIEW ORDER** |

---

| | |
|---|---|
| KYLE L. OWENS,<br><br>Plaintiff,<br><br>vs.<br><br>GAMESTOP, INC and GAMESTOP CORP,<br><br>Defendants. | No. C26-3009-LTS<br><br>**INITIAL REVIEW ORDER** |

---

| | | |
|---|---|---|
| KYLE LEE OWENS,<br><br>Plaintiff,<br><br>vs.<br><br>THE POKEMON COMPANY INTERNATIONAL and NINTENDO OF AMERICA INC,<br><br>Defendants. | | No. C26-3017-LTS<br><br>**INITIAL REVIEW ORDER** |
| KYLE LEE OWENS,<br><br>Plaintiff,<br><br>vs.<br><br>IOWA LAKES COMMUNITY COLLEGE, et al.,<br><br>Defendants. | | No. C26-3023-LTS<br><br>**INITIAL REVIEW ORDER** |

These four cases, each filed by pro se plaintiff Kyle Lee Owens, are before me for initial review pursuant to 28 U.S.C. § 1915(e)(2). In each case, Owens filed a pro se complaint and a pro se motion to proceed in forma pauperis.

## *I. MOTIONS TO PROCEED IN FORMA PAUPERIS*

Owens, who is not incarcerated, did not pay the filing fee in any of the four cases but instead filed a motion to proceed in forma pauperis in each. *See* 28 U.S.C. § 1914(a)

(requiring filing fee).[1] In order for a court to authorize the commencement of an action without the prepayment of the filing fee, a person must submit an affidavit that includes a statement of all the assets the person possesses.[2] 28 U.S.C. § 1915(a)(1). Additionally, "[s]uch affidavit shall state the nature of the action, defense or appeal and affiant's belief that the person is entitled to redress." *Id.* Owens' motions substantially comply with the requirements set out above. C26-3002-LTS, Doc. 1; C26-3009-LTS, Doc. 1; C26-3017-LTS, Doc. 1; C26-3023-LTS, Doc. 1. Because he does not have the assets necessary to pay the filing sees, his motions are granted.

## *II. INITIAL REVIEW STANDARD*

A court must liberally construe a pro se complaint. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *Smith v. St. Bernards Reg'l Med. Ctr.*, 19 F.3d 1254, 1255 (8th Cir. 1994); *see also Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004). Nevertheless, the Court may dismiss an in forma pauperis complaint if it is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant that is immune from a monetary judgment. 28 U.S.C. § 1915(e)(2).

In reviewing an in forma pauperis complaint, unless the facts alleged are clearly baseless, they must be weighed in favor of the plaintiff. *See Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992). Pro se complaints, however, must allege sufficient facts to support the plaintiff's claim. *Stone*, 364 F.3d at 914. A claim is "frivolous" if it "lacks an arguable basis in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989);

---

[1] The § 1983 fee includes the $350 filing fee set out by 28 U.S.C. § 1914(a) and the additional $55.00 administrative fee required when filing all civil actions. *See* 28 U.S.C. § 1914, *Judicial Conference Schedule of Fees*, No. 14 ("Administrative fee for filing a civil action, suit, or proceeding in a district court, $55 . . ..").

[2] Despite an oft-acknowledged typographical error, § 1915(a) applies to both prisoners and non-prisoners. *See, e.g., Hayes v. United States*, 71 Fed. Cl. 366, 367 (2006).

*accord Cokeley v. Endell*, 27 F.3d 331, 332 (8th Cir. 1994). In determining whether a complaint fails to state a claim under Section 1915(e)(2), courts generally rely on the standards articulated under Federal Rule of Civil Procedure 12(b)(6). *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997); *see also Atkinson v. Bohn*, 91 F.3d 1127, 1128–29 (8th Cir. 1996) (applying Rule 12(b)(6) standard to a dismissal under 28 U.S.C. § 1915(e)(2). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under Section § 1915(e)(2), a court may review the complaint and dismiss sua sponte those claims that fail "to raise a right to relief above the speculative level," *id.* at 555, or that are premised on meritless legal theories or clearly lack any factual basis, *see Neitzke*, 490 U.S. at 325.

## *III. C26-3002-LTS*

In C26-3002-LTS, Owens sued Iowa Central Community College (ICCC) and Vice President of Student Services Thomas Beneke.[3] C26-3002-LTS, Doc. 1-1 at 2. His complaint asserts discrimination claims under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq.*; the Fair Housing Act (FHA), 42 U.S.C. § 3601, *et seq*. and the Rehabilitation Act (RA). *Id.* at 5. He also asserts a retaliation claim under the ADA and FHA.[4] *Id.* at 5, 7.

---

[3] Owens lists only ICCC and Beneke as defendants in his complaint and his caption. However, an attached narrative states that "[d]efendants are ICCC and its administrative employees, including but not limited to Thomas Beneke, and the Housing Director." C26-3002-LTS, Doc. 1-1 at 5.

[4] At one point in his complaint, Owens lists 42 U.S.C. § 1983, along with the First and Fourteenth Amendments, as his jurisdictional basis, but does not otherwise reference § 1983. C26-3002-LTS, Doc. 1-1 at 3. He does not list a § 1983 claim in his claims or in the discussion of his claims. *Id.* at 5, 7. For "Claim 4 – Retaliation," Owens only relies on the ADA and FHA. *Id.* at 7. Moreover, his requests for relief include a declaration that defendants' "conduct constitutes unlawful retaliation for asserting rights under federal disability and housing protections." *Id.* at 9.

### *A. Americans With Disabilities Act*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "[R]ecreational activities, medical services, and educational and vocational programs at state prisons are benefits within the meaning of Title II, and qualified individual[s] with a disability are entitled to 'meaningful access' to such benefits." *Mason v. Corr. Med. Servs., Inc.,* 559 F.3d 880, 886 (8th Cir. 2009) (internal quotations and citations omitted). The statute defines a "qualified individual with a disability" as an individual "who, with or without reasonable modifications to rules, policies, or practices, … or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The Eighth Circuit has stated: "While a public entity is required to make reasonable accommodations where necessary to give 'meaningful access' to programs or benefits… the entity need not make available 'auxiliary aids and services' if it can show that to do so would be 'unduly burdensome.'" *Mason*, 559 F.3d at 886; *see also Randolph v. Rodgers*, 170 F.3d 850, 858–59 (8th Cir. 1999).

Prohibiting retaliation, the ADA also provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "To establish unlawful retaliation under the ADA, a plaintiff must show that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity." *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013). A request for an accommodation is a protected activity. *See Kirkeberg v. Canadian Pacific Ry.,* 619 F.3d 898, 908 (8th Cir. 2010). When there is

no direct evidence, "the plaintiff may establish an inference of discrimination or retaliation under the burden-shifting framework provided by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Anderson v. KAR Glob.*, 78 F.4th 1031, 1036 (8th Cir. 2023).

### *B. Fair Housing Act*

The FHA forbids discrimination "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter" and "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" "because of a handicap of" the prospective buyer or renter, a person residing in or intending to reside in the dwelling, or any person associated with the buyer or renter. 42 U.S.C. §§ 3604(f)(1), (f)(2). "Handicap" for purposes of the FHA means "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h).

A plaintiff can assert discrimination through disparate treatment or a failure to make a reasonable accommodation in violation of the FHA. *Id.* § 3604(f)(3)(B); *One Love Hous., LLC v. City of Anoka*, 93 F.4th 424, 426, 429 (8th Cir. 2024). "Disparate-treatment claims under the FHA are tested under the same framework as Title VII disparate-treatment claims." *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010) (citing *Ring v. First Interstate Mortgage, Inc.*, 984 F.2d 924, 926 (8th Cir. 1993)). "Proof of discriminatory purpose is crucial for a disparate treatment claim," with a plaintiff being required to "produce either (a) direct evidence of discriminatory intent or (b) indirect evidence creating an inference of discriminatory intent." *Id.* The "FHA links the provision of 'reasonable accommodation' to the deprivation of 'equal opportunity to use and enjoy a dwelling.'" *Hunter v. Anderson*, No. CIV. 12-2008, 2013 WL 3974342, at *11 (D. Minn. July 31, 2013) (citation omitted), *aff'd*, 563 F. App'x

508 (8th Cir. 2014), and *aff'd*, 563 F. App'x 508 (8th Cir. 2014). To state a reasonable accommodation claim, a plaintiff "must allege some nexus between the accommodation she sought and her disability." *Id.*

In addition, § 3617 "prohibits retaliation against any person on account of his having exercised or enjoyed a right granted or protected by the FHA." *Gallagher*, 619 F.3d at 838. This statute makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed …, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. Unlawful conduct under this section includes "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act." 24 C.F.R. § 100.400(c)(5). "To state a claim for retaliation under the FHA, Plaintiff must show: (1) [he] engaged in a protected activity; (2) Defendant was aware of the activity; (3) Defendant took adverse action against [the plaintiff]; and (4) there is a causal link between the adverse action and the protected activity." *United States v. Edmunds*, No. 15-CV-2705, 2016 WL 7670605, at *4 (D. Minn. Dec. 6, 2016), *report and recommendation adopted*, 2017 WL 102964 (D. Minn. Jan. 10, 2017).

### *C. The Rehabilitation Act*

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The RA defines "program or activity" to include "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b). "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of any otherwise qualified individual with a disability," 42 U.S.C. § 12112(b)(5)(A), and can come in at least two

forms: disparate treatment and the failure to provide reasonable accommodations. *See Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). In the former, the defendant must have acted with discriminatory intent, which is also required to pursue compensatory damages. *Id; Meagley v. City of Little Rock*, 639 F.3d 384, 388–89 (8th Cir. 2011); *A.J.T. ex rel. A.T. v. Osseo Area Schs.*, 605 U.S. 335, 344 (2025). In the latter, no such intent is required as the failure to provide reasonable accommodations "is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Peebles*, 354 F.3d at 767.

The enforcement, remedies, and rights are the same under both Title II of the ADA and § 504, although the RA contains the additional requirement that the plaintiff show the program or activity from which he is excluded receives federal financial assistance. *See Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir. 1998) ("cases interpreting either are applicable and interchangeable"); *Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996). To state a claim, a plaintiff must show that "(1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity which receives federal funds, and (3) he was discriminated against based on his disability." *Gorman,* 152 F.3d at 911; *see also Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999). As an affirmative defense, a defendant may demonstrate that the requested accommodation would constitute an undue burden. *See Gorman,* 152 F.3d at 911.

### *D. Discussion*

Owens asserts that he has a psychiatric disability, he was a student at ICCC who requested campus housing suitable for his disability and his service animal and ICCC approved that request. C26-3002-LTS, Doc. 1-1 at 5, 6. He asserts that he submitted documents to ICCC that established his disability and need for a service animal. *Id*. at 6. Owens attaches a January 10, 2024, letter from ICCC stating that he "qualifie[d] and has been approved for an emotional support animal"—a dog named Jack—and that any

accommodation was effective for one semester only. C26-3002-LTS, Doc. 1-2 at 7. A January 10, 2024, email from Marissa Gruenberg states that she "just pushed through your accommodation for your dog to reside with you on campus." *Id*. at 8.

Owens asserts that when he arrived in January 2024, he was placed in a small dorm room unsuitable for a disabled student with a service animal, contrary to his approved accommodation and the advertised apartment-style housing. C26-3002-LTS, Doc. 1-1 at 6. Owens then asserts that defendants imposed an "arbitrary and discriminatory" unwritten requirement that Owens cage his animal "despite the lease only requiring caging if a roommate was present" and Owens did not have a roommate. *Id*. He argues that these actions denied him "equal access to campus housing and reasonable accommodation." *Id*.

In addition, Owens asserts that he reported a neighboring student's drug use, smoking and excessive noise "immediately upon moving in" but defendants retaliated against Owens by accusing him of lying, falsely alleging his animal's misconduct, including barking at security staff, threatening to enter his room in violation of his lease and demanding Owens confine his animal to a cage. *Id.*

Owens asserts that because he feared his removal from campus housing, he secured off-campus housing on February 1, 2024. *Id.* Even though ICCC refunded a portion of his housing fees, Owens alleges that his "sudden relocation resulted in financial hardship, emotional distress and exposure to additional unsafe housing conditions." *Id.* In the fall 2024 and spring 2025, ICCC denied Owens' request to return to campus housing in Honor Roll housing. *Id.* at 7. He contends this constitutes continued retaliation. *Id.*

For injuries, Owens asserts emotional distress, loss of housing, a hostile education environment and denial of accommodations. *Id.* at 8. For relief, he requests at least $250,000 in compensatory and punitive damages and an injunction barring defendants from "imposing arbitrary rules restricting service animals" and retaliating against Owens, and ordering defendants to revise their housing policies and provide staff training. *Id.* at 8-10. He also seeks criminal charges against Beneke and ICCC. *Id.* at 11.

Owens lists four claims as a part of his complaint. Claim 1 asserts that "[d]efendants' actions denied [Owens] equal access to housing and retaliated against him for asserting rights under the ADA." *Id.* at 7. Claim 2 asserts that "[d]efendants' failure to provide housing accommodation and retaliatory conduct constitutes discrimination under Section 504" of the RA. *Id.* Claim 3 asserts that "[d]efendants' conduct included refusal of reasonable accommodation in housing, retaliatory denial of housing access, and imposition of arbitrary rules affecting a disabled individual." *Id.* Finally, Owens asserts that "[d]efendants acted to punish Plaintiff for reporting unsafe and illegal activity, asserting ADA and FHA rights." *Id.*

In sum, Owens asserts that he was denied equal access to housing and that defendants failed to provide a reasonable accommodation. However, Owens does not specify what housing accommodation he requested that defendants allegedly denied him. ICCC granted him the accommodation of a service animal to live with him, as demonstrated in the letter and email that Owens attached. ICCC assigned him a room in campus housing where he could live with his service animal. Owens does not assert that he specifically requested a particular type of housing, such as apartment-style housing. Nor does he state that ICCC denied such a request. He vaguely states that his dorm room was unsuitable and contrary to his approved accommodation, but he does not explain how it was contrary to any requested or approved accommodation. The ICCC letter states only that Owens was approved for a service animal and not particular housing.

To the extent the defendants required him to cage his service animal when he was not in the room, there is no indication that this request had a discriminatory effect on Owens or prevented him from living in his assigned dorm room with his approved service animal. Owens has failed to offer a prima face case that a particular accommodation was reasonable and necessary, but denied. He does not assert that he was informed his animal would be forced to leave his dorm, for example. Owens' factual allegations fail to demonstrate that defendants denied him reasonable or meaningful access to housing. Rather, his factual allegations establish that he opted to leave campus housing prior to

any defendant requiring him to do so. He states that he feared imminent forced removal from campus housing but does not provide any factual allegations underlying that conclusory assertion. Owens fails to establish discrimination under the ADA, FHA or RA.

As previously noted, to state a claim for retaliation Owens must show that he engaged in a protected activity, defendants were aware of that activity, defendants took adverse action against Owens and there is a causal link between the protected activity and the adverse action. Owens' complaint is unclear: it can be construed to allege that he engaged in protected activity either by reporting his neighbors to ICCC administration or by "asserting rights under the" ADA or FHA. *Id.* at 6-7. In his factual allegations under the heading "Retaliation and Harassment," Owens states that he "reported drug use, smoking and excessive noise by a neighboring student immediately upon moving in" and defendants responded by retaliating against him with false allegations of his animal's misconduct, threats to enter his room without notice and demands that he cage his animal when he left the room. In Claim 2, he makes the conclusory allegation that defendants "retaliated against him for asserting rights under the ADA" but fails to explain how he asserted those rights. For example, he does not allege that he reported an ADA violation to anyone in the ICCC administration related to a denial of an accommodation.

Owens asserts in Claim 4 that defendants "acted to punish Plaintiff for reporting unsafe and illegal activity, asserting ADA and FHA rights." *Id.* at 7. This allegation does not explain how he asserted ADA and FHA rights and whether those were acts separate from reporting his neighbors' alleged behaviors. Moreover, even assuming that Owens was engaged in protected activity, he fails to put forth factual allegations demonstrating any causal link between that activity and any adverse action. As such, Owens fails to allege a cognizable retaliation claim.

Owens requests that defendants be charged with federal crimes. C26-3002-LTS, Doc. 1-1 at 11-17. However, private citizens have no standing to file criminal charges

in federal court. *Jones v. Clinton*, 206 F.3d 811, 812 (8th Cir. 2000). As the United States District Court for the District of Nebraska explained:

> The prosecution of criminal actions in the federal courts is a matter solely within the discretion of the Attorney General of the United States and duly authorized United States Attorneys. *United States v. Bryson*, 434 F. Supp. 986, 988 (W.D. Okla. 1977) (collecting cases). "[I]t is today beyond all reasonable doubt that 'the prosecution of violations of federal criminal law in federal court is a function of the federal government, not private parties,' (*Nagy*, 2012 WL 1858983, at *2), and federal courts lack the power to direct the filing of criminal charges." *Mikhail v. Kahn*, 991 F. Supp. 2d 596, 636 (E.D. Pa.) *aff'd*, 572 F. App'x 68 (3d Cir. 2014).

*In re Higgins*, No. 8:15–CV–103, 2015 WL 1651424, at *1 (D. Neb. 2015); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996) (making clear that it is the executive branch that retains broad discretion to enforce the nation's criminal laws). Thus, to the extent Owens is requesting that criminal charges be brought against any defendant, his request is denied.[5]

Owens fails to state a cognizable claim of discrimination or retaliation. As such, the complaint in case C26-3002-LTS is dismissed.

## *IV. C26-3009-LTS*

In C26-3009-LTS, Owens sued GameStop, Inc., and/or GameStop Corp. for racial discrimination, retaliation and constructive discharge in violation of Title VII of the Civil Rights Act. C26-3009-LTS, Doc. 1-1 at 5. Owens asserts that he is white and another employee told him that she hates white people on March 6, 2024. *Id.* Owens states that he reported the incident via email to human resources at GameStop, requesting an investigation. *Id.* at 6. Hours later he received an email response that an investigation

[5] Owens is free to report criminal law violations to the appropriate law enforcement agency.

would be opened.[6] *Id.* Owens also reported an incident in which the father of a store leader used the racial slur "cracker" in the store in front of Owens and customers. *Id.* Owens states that, after he reported the incidents, he requested an interim leave during the investigation "due to the hostile environment" but his request was denied. *Id.* at 6-7. He states that "Human Resources informed Plaintiff that he was not permitted to take leave and that failure to return to work would result in termination" on March 8, 2024. *Id.* at 7; C26-3009-LTS, Doc. 1-2 at 7. He states that he "made clear he was not voluntarily resigning" but he was "placed in an untenable position: either return to a racially hostile and retaliatory environment or lose my employment." C26-3009-LTS, Doc. 1-1 at 7; C26-3009-LTS, Doc. 1-2 at 3. On an attached Iowa Office of Civil Rights Complaint Form, he states that his employment ended on March 7, 2024. C26-3009-LTS, Doc. 1-2 at 16.

Owens argues that "[e]xplicit racial hostility constitutes direct evidence of discriminatory animus." C26-3009-LTS, Doc. 1-1 at 8. He asserts that "[t]he racial composition of the store workforce, Plaintiff's status as the only white employee; which was also greatly disproportionate and inconsistent to the local demographics of the populace, and tolerance of racial slurs support circumstantial inference." *Id.* Owens also asserts that defendants retaliated against him by refusing to let him take an interim leave, and that he was constructively discharged from his position. For relief, Owens seeks at least $125,000 in compensatory damages for emotional pain and suffering, at least $125,000 in punitive damages, back pay and lost wages, front pay in lieu of reinstatement, and an injunction barring defendant "from engaging in further discriminatory or retaliatory conduct." *Id.* at 9-11.

[6] He states that he "further reported that the Store Leader . . . is Hispanic and had hired two additional employees who were both Hispanic women, making me the only white employee at the store." C26-3009-LTS, Doc. 1-2 at 2.

***A. Title VII***

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In addition, Title VII "prevents employers from retaliating against employees who have acted to vindicate their statutorily protected rights by reporting harassment or discrimination in the workplace." *Brannum v. Mo. Dep't of Corrs.*, 518 F.3d 542, 547 (8th Cir. 2008); *see Warren v. Kemp*, 79 F.4th 967, 972 (8th Cir. 2023); 42 U.S.C. § 2000e-3(a). To establish retaliation under Title VII, a plaintiff must prove (1) he engaged in statutorily protected activity, (2) suffered an adverse employment action, and (3) that the engagement in a protected activity is the but-for cause of the adverse employment action. *See Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 436 (8th Cir. 2016).

Constructive discharge requires more than just a Title VII violation by an employer. *Phillips v. Taco Bell Corp.,* 156 F.3d 884, 890 (8th Cir. 1998). "A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit." *Johnson v. Runyon,* 137 F.3d 1081, 1083 (8th Cir.) (internal quotations omitted), *cert. denied,* 525 U.S. 916 (1998). "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit." *Summit v. S–B Power Tool,* 121 F.3d 416, 421 (8th Cir. 1997) (internal quotations omitted), *cert. denied,* 523 U.S. 1004 (1998); *see also Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir. 1996). In other words, the employer's actions must have been intended to force the employee to quit, meaning the employee's resignation must be a reasonably foreseeable consequence of the employer's discriminatory actions. *Allen v. Bridgestone/Firestone, Inc.,* 81 F.3d 793, 796 (8th Cir.1996) (citing *Hukkanen v. International Union of Operating Engineers,* 3 F.3d 281, 285 (8th Cir.1993)). In addition, to prove that he was constructively discharged, a

plaintiff must demonstrate that a reasonable person would find the working conditions intolerable. *Allen,* 81 F.3d at 796. Such intolerability of working conditions is judged by an objective standard, not the plaintiff's subjective feelings. *Id.* Finally, to be reasonable " 'an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged.' " *Summit,* 121 F.3d at 421 (quoting *Tidwell,* 93 F.3d at 494); *see also Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1247 (8th Cir. 1998).

Claims brought under Title VII are subject to time and exhaustion requirements. "Exhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts." *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 180-81 (1989)). Title VII requires that an individual's charge of discrimination be filed with the EEOC:

> within one hundred and eighty days after the alleged unlawful employment practice occurred …, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency …, such charge shall be filed … within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier[.]

42 U.S.C. § 2000e-5(e)(1). To exhaust administrative remedies an individual must: (1) timely file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) setting forth the facts and nature of the charge and (2) receive notice of the right to sue. *See* 42 U.S.C. § 2000e-5(b), (c), (e), (f)(1); *see also Hanenburg v. Principal Mut. Life Ins. Co.,* 118 F.3d 570, 573 (8th Cir. 1997). A plaintiff has 90 days

from the receipt of the right-to-sue letter to file a civil complaint in district court.[7] 42 U.S.C.A. § 2000e–5(f)(1); *see also McMillian v. Miss. Lime Co.,* No. 4:07CV960-DJS, 2007 WL 4482164, at *1–2 (E.D. Mo. Dec. 18, 2007), *aff'd*, 311 Fed. App'x 942 (8th Cir. 2009).

### *B. Discussion*

Owens does not assert that he received a right-to-sue letter for his Title VII claim. Rather, Owens states that he:

> attempted to file with the EEOC but was procedurally blocked by the EEOC intake system. Plaintiff then contacted the EEOC, where they replied weeks later, with circular reasoning, not remedying the online intake too[l] blocking the filing, but rather simply saying 'use the online tool,' where a subsequent reply to their reply was made, demanding them to cease circular reasoning and provide remedy and answer to either an alternative way to file or provide right to sue letter, and providing them with a set duration to comply; thus fully exhausting remedies with the EEOC.

C26-3009-LTS, Doc. 1-1 at 7. Owens attaches emails indicating that he contacted the EEOC on December 29, 2025, with a request to file a charge of discrimination and that the EEOC provided an automated response noting that there is a time limit of either 180 or 300 days to file a charge. C26-3009-LTS, Doc. 1-2 at 6. He also includes an informational self-screening from the EEOC website that states that he had 300 days to file with the EEOC, he reported that the discriminatory action occurred on March 9, 2024, and "[f]rom the information you gave us, it looks like your time has run out." *Id.* at 10. However, it also instructs him to contact an EEOC office as soon as possible "so that we can figure out whether or not you still have time to file a charge." *Id.* Moreover,

[7] The 90-day limitation period is not jurisdictional and "is, therefore, subject to equitable tolling in appropriate circumstances." *Hill v. John Chezik Imports,* 869 F.2d 1122, 1123-24 (8th Cir. 1989). A plaintiff may allege exceptional circumstances exist that warrant tolling of the 90-day period, but "[c]ourts have generally reserved the remedy of equitable tolling for circumstances which were truly beyond the control of the plaintiff." *Howard v. Boatmen's Nat. Bank of St. Louis,* 230 F.3d 1363 (8th Cir. 2000).

the website states that "[a]lthough your time may have run out, you make still file a charge with EEOC if you wish." *Id.* The latest date that Owens references for a negative employment action is March 9, 2024, and the only date in the record for his contact with the EEOC is December 29, 2025. As such, the pleadings demonstrate that Owens waited over 600 days to contact the EEOC, well outside the time limit for filing a charge of discrimination with the EEOC.

Owens states that he "acted diligently and in good faith, and has fully exhausted remedies; and files this federal suit within the 2 year statutory requirement." C26-3009-LTS, Doc. 1-1 at 8. However, he provides no reason for his delay in seeking to pursue a charge with the EEOC. He focuses on the statute of limitations for filing a claim in federal court, but he ignores the fact that he was over 300 days late attempting to file a charge with the EEOC. He does not assert that there were circumstances truly beyond his control that prevented him from filing a charge with the EEOC and thus satisfying the procedural requirements established by Congress. *See Shempert v. Harwick Chem. Corp.*, 151 F.3d 793, 797–98 (8th Cir. 1998) ("equitable tolling is a remedy reserved for circumstances that are 'truly beyond the control of the plaintiff.'").

Owens did not file a timely charge with the EEOC. Nor did he receive a right-to-sue letter from the EEOC. Because he has not exhausted the administrative remedies, his Title VII claims will be denied and case C26-3009-LTS will be dismissed.

## *V. C26-3017-LTS*

In C26-3017-LTS, Owens asserts antitrust claims under the Sherman Act and state law claims against the Pokémon Company International and Nintendo of America, Inc. C26-3017-LTS, Doc. 1-1 at 6. He states that defendants "operate a nationwide organized-play system for Pokémon card and video game events . . . [and] control who may act as an official Pokémon professor, who may host sanctioned Pokémon events, who may use official event tools, and who may appear in official event-location resources." *Id.* at 8. Owens asserts that defendants denied his application to the Pokémon

Professor certification program, excluded him from access to official organized-play tools and deprived him of commercial and economic opportunities. *Id.*

Pokémon's website provides that "Pokémon Professors offer their time at Play! Pokémon events around the world, working as assistants, judges, and ambassadors for the Play! Pokémon program."[8] The Professor Program website states that "[t]he Pokémon Professor Program is a global network of passionate and knowledgeable fans who volunteer their time to help ensure that Play! Pokémon events the world over are run to an exceptional standard."[9] Professors help teach others to play, uphold the "rules and spirit of the game," and run tournaments. In return, Professors are eligible to earn points to spend at the Professor Store, participate in Professor Cups with prizes and get "swag." There are application requirements to become a Pokémon Professor, including an exam and a background check for applicants from certain countries (including the United States) because "[t]he Pokémon Company International (TPCi) is committed to helping create a safe environment for children who participate in tournaments affiliated with Pokémon."[10]

Owens asserts that he passed the Pokémon Professor certification exam with a score of 100 percent but defendants denied his application after receiving the results of his background check. C26-3017-LTS, Doc. 1-1 at 8-9. Owens attaches a March 12, 2024, email from Pokémon Customer Service that states that he passed the Professor Rank Basic exam, but states that "[b]efore we can welcome you to the program, we need you to complete our background check process." *Id.* at 25. On March 16, 2024, Owens signed the associated consent with the third-party provider First Advantage Background Services Corporation, which informed him that for his volunteer application it would

---

[8] http://pokemon.com/us/play-pokemon/organize/become-a-pokemon-professor (last visited Aug. 25, 2026).

[9] http://professorprogram.pokemon.com/page/about-professors (last visited Aug. 25, 2026).

[10] http://professorprogram.pokemon.com/page/join (last visited Aug. 25, 2026).

collect and process various information, including "[c]riminal proceedings, convictions and involvement in litigation, including civil suits where the subject was either a plaintiff or defendant." *Id*. at 27.

Owens contends that the resulting background check report referenced an Illinois felony conviction that was more than ten years old and three Pennsylvania misdemeanor matters. *Id*. at 9. He contends that defendants initially relied on the Illinois felony but after he challenged that basis they instead relied upon three Pennsylvania misdemeanor matters that were not convictions. *Id.* Owens attaches a March 20, 2024, letter from First Advantage and a report with search date of March 19, 2024, that lists January 7, 2022, charges for "disorderly conduct, engage in fighting;" "make repairs/sell/offensive weapons deals in uses, or possesses;" and "criminal mischief damage property," all with a disposition of "pending warrant issued for failure to appear." *Id.* at 34-35. The report he provides does not reference any felony conviction more than ten years old. Owens attaches a May 6, 2024, email from Pokémon Customer Service that states "[w]e regret to inform you that your application to the Professor program has been denied, after reviewing the results of your background check." *Id.* at 41.

Owens asserts that defendants "misused, misapplied, and improperly relied upon the reported information to deny [Owens] certification and bar him from the Pokémon Professor system, and in doing so, violated Iowa Employment Law." *Id*. at 9. Owens asserts that "[d]efendants nevertheless treated those non-conviction matters as grounds to deny Plaintiff certification, restrict Plaintiff's access, and bar Plaintiff from official Pokémon Professor tools and benefits" even though they failed to provide "a fair process, meaningful appeal, or rational explanation before depriving Plaintiff of certification and access." *Id*. at 9. He argues that the denial caused him to "lose access to official certification, official event tools, the event locator, official Pokémon event-hosting authority, prospective customer traffic, goodwill, business opportunity, and economic benefits." *Id*.

Owens asserts federal question jurisdiction based on two claims under the Sherman Act. *Id.* at 9-11. He also asserts diversity jurisdiction and supplemental jurisdiction over state law claims of promissory estoppel, breach of implied contract, tortious interference with prospective business advantage and negligent misrepresentation. *Id.* at 12-14. For relief, Owens seeks certification as a Pokémon professor with access to associated tools, damages of at least $341,000 and unspecified "declaratory and injunctive relief." *Id.* at 15.

### *A. Sherman Act Claims*

The Sherman Act authorizes two types of antitrust claims: § 1 generally prohibits contracts that unreasonably restrict trade while § 2 prohibits the monopolization of a given market. *See* 15 U.S.C. §§ 1, 2. Section 1 makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States …." 15 U.S.C. § 1. "[A] plaintiff must show an agreement in the form of a contract, combination, or conspiracy that imposes an *unreasonable* restraint on trade." *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1058 (8th Cir. 2000) (emphasis added). The unreasonableness of a restraint is evaluated using either a per se standard or the rule of reason test, which examines all of the circumstances. *Id.* "Practices that have been held to be illegal per se include price fixing, division of markets, group boycotts, and tying arrangements." *Id.* Under the rule of reason test, the plaintiff must properly define the relevant market and show that the restraint has "detrimental effects" upon the competitiveness of the market. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388 (8th Cir. 2007). In doing so, the "plaintiff must define both the relevant product market, which includes 'all reasonably interchangeable products,' and the relevant geographic market, which consists of the 'area in which consumers can practically seek alternative sources of the product.'" *Id.* (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).

Section 2 makes it unlawful to "monopolize, or attempt to monopolize … any part of the trade or commerce among the several States …." 15 U.S.C. § 2. Monopolization requires: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). "As the Supreme Court has noted repeatedly, Congress enacted the antitrust laws to protect competition, not competitors." *Midwest Commc'ns v. Minnesota Twins, Inc.*, 779 F.2d 444, 450 (8th Cir. 1985). The Sherman Act "directs itself not against conduct, which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does not do so out of solicitude for private concerns but out of concern for the public interest." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). To prevail on a § 2 claim, a plaintiff must adequately plead a relevant market. *See Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 446–47 (8th Cir. 2023); *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) (plaintiff "has the burden of alleging a relevant market in order to state a plausible antitrust claim. Without a well-defined relevant market, a court cannot determine the effect that an allegedly illegal act has on competition."); *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007) ("To establish that a defendant possesses the requisite market power required for monopolization liability, a plaintiff must establish that the defendant has a dominant market share in a well-defined relevant market."). "The definition of the relevant market has two components—a product market and a geographic market." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995).

To have standing, a plaintiff must allege they suffered an antitrust injury, which is an injury that harms competition generally. *Goldfinch Lab'y, P.C. v. Iowa Pathology Assocs., P.C.*, No. 4:24-CV-00168, 2024 WL 5205936, at *4 (S.D. Iowa Dec. 13, 2024), *aff'd,* 168 F.4th 500 (8th Cir. 2026); *see also Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1151 (9th Cir. 2003) ("Where the defendant's conduct harms

the plaintiff without adversely affecting competition generally, there is no antitrust injury."). The Court must determine whether the plaintiff is "the target of the anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury." *Midwest Commc'ns*, 779 F.2d at 451 (internal quotation marks and citation omitted). "In evaluating a plaintiff's statutory standing, the Court considers: 1) the causal connection between the alleged antitrust violation and harm to the plaintiff, and whether that harm was intended; 2) whether the alleged harm is of a type Congress sought to redress in providing a private remedy for violations of the antitrust laws; 3) the directness of the alleged antitrust injury; 4) the existence of more direct victims of the alleged antitrust injury; and 5) problems of identifying damages and apportioning them among those directly and indirectly harmed." *Goldfinch Lab'y, P.C. v. Iowa Pathology Assocs., P.C.*, No. 4:24-CV-00168, 2024 WL 5205936, at *4 (S.D. Iowa Dec. 13, 2024), *aff'd,* 168 F.4th 500 (8th Cir. 2026) (citing *Assoc. Gen. Contractors of Cal.*, 459 U.S. at 537–45; *accord Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 520 (8th Cir. 1992)). The first two factors address antitrust injury while the other three factors focus on the directness or remoteness of the plaintiff's alleged antitrust injury. *Goldfinch Lab'y*, 2024 WL 5205936, at *4.

"[A]ntitrust injury is a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws." *Fischer v. NWA, Inc.*, 883 F.2d 594, 597 n.5 (8th Cir. 1989). "An antitrust injury is 'injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1144–45 (8th Cir. 2011) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "[I]f there is no showing of injury, or if the injury alleged … is not an 'antitrust injury,' the plaintiff does not have a claim cognizable under the antitrust laws." *Midwest Commc'ns*, 779 F.2d at 450. An antitrust injury represents "the type of loss that the claimed violations … would be likely to cause." *Brunswick Corp.*, 429 U.S. at 489. "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from

a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by violation." *Brunswick Corp.*, 429 U.S. at 489. An "injury, although causally related to an antitrust violation, … will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive [behavior] …, since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Atl. Richfield Co.*, 495 U.S. at 334 (cleaned up). Numerous cases have denied antitrust standing to a corporation's sole shareholders, officers, employees, lessors, guarantors, and creditors. *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 521 (8th Cir. 1992).

Owens asserts defendants violated § 1 of the Sherman Act through an unreasonable restraint of interstate trade. He asserts that "[d]efendants' certification, approval, event-hosting, and event-locator system functions as a gatekeeping mechanism controlling participation in a defined commercial ecosystem: official Pokémon organized-play event hosting, official Pokémon tournament organization, and related retail/customer-generating activity." C26-3017-LTS, Doc. 1-1 at 9. Owens asserts that the "rules and restrictions prevent persons from freely hosting official Pokémon events without [d]efendants' authorization" and that "[d]efendants' certification and event-access restrictions operate as an unreasonable restraint when applied arbitrarily, inconsistently, and without lawful or competitive justification." *Id.* at 10. He states that "[b]y denying [Owens] certification after he passed the exam, and by relying on non-conviction criminal-history information without a rational nexus, [d]efendants excluded [Owens] from the official event-hosting market." *Id.* He contends that "[d]efendants' conduct did not merely injure [Owens] personally; it reduced competition and consumer access by excluding a qualified Iowa-based event host from the official organized-play system." *Id*.

Owens also asserts defendants violated § 2 of the Sherman Act. He states that "[d]efendants possess monopoly power or market-controlling power over the relevant

market of official Pokémon organized-play certification, official Pokémon event authorization, Pokémon Professor access, and official Pokémon event-location listing." *Id*. at 10. He contends that defendants "willfully maintained or exercised that market power by excluding [Owens] from the official system after [Owens] passed the certification exam." *Id*. at 11. Owens argues that defendants] "exclusionary conduct was not based on failure to pass the exam, lack of qualification, lack of ability, or failure to complete the certification process" but instead "shifting criminal-history explanations." *Id*. at 11. He states that defendants' "conduct was exclusionary because it prevented [Owens] from competing as an Iowa-based official Pokémon event host and prevented customers and players from accessing [Owens'] prospective events." *Id*.

Owens' injuries are not antitrust injuries. They do not stem from conduct affecting competition generally. Requiring volunteers affiliated with an offered product—which is targeted at least in part to children—to complete a background check, and then rejecting volunteers based on the results of those checks, does not constitute an anticompetitive act. Such a safety and liability-minimizing requirement is reasonable and not designed to limit competition. As such, Owens' pleading fails to establish he suffered a requisite antitrust injury and he lacks federal antitrust standing. Both Sherman Act claims will be dismissed.

### *B. State Law Claims*

As previously noted, Owens also asserts several state law claims, including promissory estoppel, breach of implied contract, tortious interference with prospective business advantage and negligent misrepresentation.

#### *1. Jurisdiction*

Owens relies on both diversity jurisdiction and supplemental jurisdiction for his state law claims. The Court has an obligation to determine whether subject matter jurisdiction exists. *See Sac & Fox Tribe of the Mississippi in Iowa, Election Bd. v.*

*Bureau of Indian Affairs*, 439 F.3d 832, 836 (8th Cir. 2006); FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action."). District courts have diversity jurisdiction "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a).

With respect to the amount in controversy, a "complaint that alleges the jurisdictional amount in good faith will suffice to confer jurisdiction, but the complaint will be dismissed if it appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount." *Larkin v. Brown*, 41 F.3d 387, 389 (8th Cir. 1994) (citation omitted). The legal certainty standard is satisfied "where the legal impossibility of recovery is so certain as virtually to negative the plaintiff's good faith in asserting the claim." *Peterson v. The Travelers Indem. Co.*, 867 F.3d 992, 995 (8th Cir. 2017); s*ee also Kopp v. Kopp*, 280 F.3d 883, 884 (8th Cir. 2002) (stating that the types of cases where maximum award can be determined to a legal certainty include "cases involving liquidated damages, statutory limits on damages, or where damages are unavailable altogether"). "The jurisdictional fact in this case is not whether the damages are greater than the requisite amount, but whether a fact finder might legally conclude that they are: In other words, an amount that a plaintiff claims is not 'in controversy' if no fact finder could legally award it." *Id.* at 885 ("As we see it, the federal court has jurisdiction here unless, as a matter of law, Ms. Kopp could not recover punitive damages or damages for emotional distress, the amount of damages that she could recover is somehow fixed below the jurisdictional amount, or no reasonable jury could award damages totaling more than $75,000 in the circumstances that the case presents.").

Here, Owens has asserted a claim for $341,000, an amount in controversy that exceeds the jurisdictional threshold. However, allegation of actual damages in that amount is dubious, if not outright absurd. Owens is challenging his denial of a volunteer position for Pokémon events, with Pokémon offering incentives such as swag and points toward prizes. However, he is not *barred* from recovering more than $75,000 as a matter

of law. At this juncture, the Court cannot say to a legal certainty that his claims are for less than the jurisdiction amount of $75,000. *See Knight v. Phillips*, No. 8:21CV408, 2022 WL 542564, at *2 (D. Neb. Feb. 23, 2022) ("Although the court has serious misgivings regarding the truthfulness of Plaintiff's allegation that the amount in controversy exceeds $75,000, at this point in time it cannot say to a legal certainty that the claim is really for a lesser amount.").

As for diversity of the parties, complete diversity is required and "[c]omplete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship." *OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007). Here, Owens alleges that he is an Iowa citizen and defendants are Washington citizens.[11] C26-3017-LTS, Doc. 1-1 at 8. It appears, based on Owens' allegations in his complaint, that there is complete diversity of citizenship and thus subject matter jurisdiction exists in federal court. As such, I need not address his alternative basis of supplemental jurisdiction.

### *2. Promissory Estoppel*

Owens first asserts a state law claim of promissory estoppel, stating that defendants represented that a person who passes the examination and satisfies lawful eligibility standards will obtain Professor certification. C26-3017-LTS, Doc 1-1 at 12. He contends that he passed the examination with a 100 percent score. *Id*. Owens states that he reasonably relied on his pass notification and the certification process, but defendants changed the stated reason for his certification denial and he suffered losses as a result. *Id*.

A claim for promissory estoppel under Iowa law requires a plaintiff to prove:

[11] Owens states that the Pokémon Company International is a Washington citizen, but does not address the citizenship of Nintendo of America Inc. on his civil complaint form. C26-3017-LTS, Doc. 1-1 at 7. However, in the narrative of his statement of claim he states that "[d]efendants are believed to be citizens of Washington and/or other states." *Id.* at 8.

> (1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

*Kunde v. Est. of Bowman,* 920 N.W.2d 803, 810 (Iowa 2018) (quoting *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 49 (Iowa 1999)). Promissory estoppel requires "strict proof" for each element. *Kolkman v. Roth*, 656 N.W.2d 148, 156 (Iowa 2003) (citing *Schoff*, 604 N.W.2d at 48–49).

A promise is "clear" when easily understood and unambiguous, and it is "definite" when explicit and without doubt or tentativeness. *Anderson v. EPCO Carbon Dioxide Prods., Inc.*, No. 4:04-CV-40151, 2006 WL 8436940, at *8 (S.D. Iowa June 21, 2006) (citing *Schoff,* 604 N.W.2d at 50-51); *see also Denner v. Deere & Co.,* No. 03–2057, 2005 WL 1532607, at *8–9 (N.D. Iowa Jan.7, 2005) (granting summary judgment on a promissory estoppel claim for failure to establish a clear and definite promise and determining that an employer's statement to a potential employee that "everything is clear" for the employment to commence was not a clear and definite promise that the employer would not fire the employee based upon his criminal record where there was no evidence presented that the employer was referring to the employee's criminal record or understood that the record involved theft from the employer), *aff'd,* No. 05–1371, 2005 WL 2293473 (8th Cir. Sept. 21, 2005). However, Iowa courts require "much more than mere nonperformance of a promise … to obtain the benefits of promissory estoppel." *Id.* (citing *Warder & Lee Elevator, Inc. v. Britten*, 274 N.W.2d 339, 343 (Iowa 1979)). The focus of the promissory estoppel doctrine is the "protection of reliance-type interests." *Kunde*, 920 N.W.2d at 810.

Owens fails to identify a "clear and definite" promise that defendants made. He does not point to a clear promise that he would be granted certification if he passed the examination and did not have recent criminal convictions, as opposed to charges or

criminal proceedings, in his background check. The factual allegations in the complaint do not demonstrate a clear and definite promise. *See Mobro, Inc. v. VVV Corp.*, No. 12-CV-25-JSS, 2012 WL 2429242, at *7 (N.D. Iowa June 26, 2012) ("The facts in the Complaint do not support the allegation that Clark Co. made a 'clear and definite promise,' . . . to pay Mobro a five-percent commission on work done by other ServiceMaster Clean franchisees" which is an "insuperable bar to relief."). As such, as a matter of law, Owens cannot meet the first promissory estoppel element. *See Wagner Enters., Inc. v. John Deere Shared Servs., Inc.*, 397 F. Supp. 2d 1097, 1110 (N.D. Iowa 2005).

In addition, Owens has failed to allege facts sufficient to support the third promissory estoppel element that he acted to his substantial detriment in reasonable reliance on a promise. His factual allegations do not demonstrate that he acted to his substantial detriment. For example, he does not allege that he purchased materials or otherwise made expenditures to host Pokémon events. At a minimum, Owens' complaint does not allege the third element of promissory estoppel. This claim will be denied.

### *3. Breach of Implied Contract*

Owens asserts that defendants created an implied contract by "offering a certification program, administering an examination, requiring compliance with program terms, and providing official access to those who successfully complete the process." C26-3017-LTS, Doc. 1-1 at 12. He asserts that he, in turn, accepted by applying, passing the examination and agreeing to the background screening. *Id.* He alleges that defendants breached the contract by refusing his certification, changing the denial reason, relying on non-conviction misdemeanor matters and "failing to provide a rational nexus between the records and the role." *Id.*

The Iowa Supreme Court has recognized that contracts may be either express or implied, and that when parties manifest their agreement by conduct the contract is implied in fact. *Faith Bible Christian Outreach Ctr., Inc. v. C.H. Moore Tr. Est.*, No. C96-

4069, 1998 WL 35179229, at *13 (N.D. Iowa Nov. 6, 1998), *aff'd sub nom. Faith Bible Christian Outreach Ctr., Inc. v. Warner*, 201 F.3d 1020 (8th Cir. 2000). To maintain a breach of contract claim, Owens must plausibly plead (1) that a contract existed, (2) the terms and conditions of the contract, (3) that he performed under the contract, (4) that defendants had breached the contract and (5) Owens suffered damages resulting from the breach. *See Stokes v. A.Y. McDonald Indus., Inc.*, No. C26-1002, 2026 WL 1651283, at *5 (N.D. Iowa June 8, 2026) (citing *Royal Indem. Co. v. Factory Mut. Ins.*, 786 N.W.2d 839, 846 (Iowa 2010)). "To form an implied contract, the parties must show through their conduct a shared agreement to bind themselves to agreed-upon terms. These terms 'must be sufficiently definite for the court to determine the duty of each party and the conditions of performance.'" *Stokes*, 2026 WL 1651283, at *6 (quoting *Konchar v. Pins*, 989 N.W.2d 150, 158 (Iowa 2023)).

Here, Owens' complaint must identify the specific provision of the contract allegedly breached by the defendants, which he fails to do. Moreover, assuming without deciding that an implied contract was created through the Pokémon website's volunteer application process and Owens' submitting an application through that process, Owens' factual allegations do not demonstrate a breach of any such contract. He does not state the defendants agreed to certify him regardless of the results of the background check. Rather, Owens asserts that as a part of his acceptance he agreed to the background screening. In doing so, he signed the consent that agreed to the collection of not only criminal convictions but also "[c]riminal proceedings" and "involvement in litigation, including civil suits where the subject was either a plaintiff or defendant." As such, any certification was contingent upon those results to the defendants' satisfaction.

Owens does not assert that the implied contract set forth a term that only a recent criminal conviction would result in a rejection of his application. Nor can he. The criminal proceedings on Owens' background check and Pokémon's email that his application has been denied "after reviewing the results of your background check" demonstrate that a condition precedent of his certification, *i.e.*, a favorable background

check, was not satisfied and thus he was ineligible. *See Enigwe v. U.S. Airways/U.S. Airways Express*, 438 F. App'x 80 (3d Cir. 2011) (no breach of contract in termination of conditional offer of employment to a job applicant who failed to pass a background check; "without a favorable background check, he did not have an offer of employment"); *Friedman v. Sunrise Senior Living Mgmt., Inc.*, No. 23 CIV. 8901, 2025 WL 958550, at *9 (S.D.N.Y. Mar. 31, 2025) ("Where, as here, a conditional offer of employment is rescinded because the conditions are not satisfied, no employment relationship comes into existence."). As such, defendants cannot be deemed to be in breach. This claim will be denied.

### *4. Tortious Interference with Prospective Business Advantage*

In his claim of tortious interference with prospective business advantages, Owens asserts that he "had a prospective business expectancy in hosting official Pokémon events in Iowa" but that defendants "intentionally and improperly interfered" with that "by denying certification, barring event tool access, and excluding [Owens] from the event locator system." C26-3017-LTS, Doc. 1-1 at 13. He further alleges that he had "a reasonable probability of future economic benefit because official Pokémon events bring customers, players, inventory sales, goodwill, repeated business, and community engagement, and the Pokémon Locator tool, allows business and location listing through the official Pokémon website." *Id.* He also asserts that defendant "knew or should have known that Pokémon Professor certification and event locator access create commercial opportunity and customer traffic." *Id.*

Under Iowa law, there are five elements of a claim for tortious interference with prospective economic benefit:

1. A prospective contractual or business relationship;
2. the defendant knew of the prospective relationship;
3. the defendant intentionally and improperly interfered with the relationship;

4. the defendant's interference caused the relationship to fail to materialize; and
5. the amount of resulting damages.

*Iowa Coal Min. Co., Inc. v. Monroe County,* 555 N.W.2d 418, 438 (Iowa 1996). The Iowa Supreme Court has held that the third element—intentionally and improperly interfered—requires "proof that the defendant intended to financially injure or destroy the plaintiff." *Id.* (citing *Burke v. Hawkeye Nat'l Life Ins. Co.,* 474 N.W.2d 110, 115 (Iowa 1991)); *Blumenthal Inv. Trusts v. City of W. Des Moines*, 636 N.W.2d 255, 269 (Iowa 2001); *accord Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 283 (Iowa 1998) ("'Interference with a prospective contract is an intentional tort which requires a showing that the sole or predominant purpose of the actor's conduct was to financially injure or destroy the plaintiff,' " (quoting *Willey v. Riley,* 541 N.W.2d 521, 526 (Iowa 1995)). "If, in tortuously interfering with a prospective economic advantage, 'a defendant acts for two or more purposes, his improper purpose must predominate in order to create liability.'" *MicroSource, LLC v. Eco World Grp., LLC*, No. 19-CV-4016, 2019 WL 11253127, at *3 (N.D. Iowa Oct. 30, 2019) (quoting *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 799 (Iowa 1984)). "Alternatively, tortious interference 'may also be committed by improper means,' including deceit, misrepresentation, defamation, and disparaging falsehood." *Id.*

Here, Owens fails to plead factual allegations demonstrating defendants intentionally interfered with any business relationship. Defendants did not spread false information about Owens or otherwise intentionally communicate with his potential third parties. *Cf. Lite-Netics, LLC v. Nu Tsai Cap. LLC*, No. 8:22CV314, 2022 WL 6151898, at *9 (D. Neb. Oct. 7, 2022) ("In this case there are at least reasonable inferences that HBL had business relationships or expectancies with the companies to which Lite-Netics sent its allegedly tortious communications and that Lite-Netics knew of these business relationships."). Nor do Owens' factual allegations demonstrate that defendants intended to financially injure or destroy Owens. Rather, defendants simply declined to certify an

individual with a history of criminal proceedings through their Professor program and thus provide him a stamp of approval as a volunteer to work with Pokémon enthusiasts that include children. As such, Owens fails to state a cognizable claim of tortious interference and this claim will be denied.

### *5. Negligent Misrepresentation*

Owens' negligent misrepresentation claim is based on his allegation that defendants informed Owens that he passed the examination requirement but "later supplied inconsistent, changed, or misleading reasons for denial." C26-3017-LTS, Doc. 1-1 at 14. He asserts that defendants "failed to exercise reasonable care in reviewing, interpreting, applying and communicating criminal-history information." *Id.* He generally states that he "reasonably relied on [d]efendants' certification process and communications." *Id.*

The Iowa Supreme Court has stated:

> The elements for the tort of negligent misrepresentation are: (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. (2) … [T]he liability stated in Subsection (1) is limited to loss suffered (a) by the person … for whose benefit and guidance he intends to supply the information …; and (b) through reliance upon it in a transaction that he intends the information to influence….

*Barske v. Rockwell Int'l Corp.,* 514 N.W.2d 917, 924 (Iowa 1994). The tort of negligent misrepresentation "does not apply when a defendant directly provides information to a plaintiff in the course of a transaction between the two parties, which information harms the plaintiff in the transaction with the defendant." *Sain v. Cedar Rapids Cmty. School Dist.,* 626 N.W.2d 115, 126 (Iowa 2001).

As with all negligence actions, a plaintiff must show that the defendants owed him or her a duty of care. *Id.* at 124-25 (explaining that a "special relationship" is an "important factor to support the imposition of a duty of care under a claim for negligence"). "Whether such a duty exists is always a question of law for the court." *Fry v. Mount,* 554 N.W.2d 263, 265 (Iowa 1996) (citing *Hoffnagle v. McDonald's Corp.,* 522 N.W.2d 808, 811 (Iowa 1994)). "[T]his duty arises only when the information is provided by persons in the business or profession of supplying information to others." *Id.; see also Molo Oil Co.,* 578 N.W.2d at 227 ("[A] person in the profession or business of supplying information or opinions owes a duty of reasonable care to clients and others."). The duty does not apply where a retailer is in the business of selling and servicing its goods, and, if the transaction at issue was an arm's length transaction, there is no duty of care. *Id.* Providing false information is not enough to sustain a negligent misrepresentation claim. *Meier v. Alfa–Laval, Inc.,* 454 N.W.2d 576, 581 (Iowa 1990) (providing that merely providing false information is not an actionable claim of negligent misrepresentation).

Owens provides no factual allegations supporting the existence of any duty of care from the defendants to Owens. "This situation is more like an arms-length transaction than a situation where an attorney, accountant or counselor provides information to a person who then relies upon that information and is harmed in dealings with third parties." *W. Rsrv. Life Assur. Co. of Ohio v. Bratton*, 464 F. Supp. 2d 814, 842 (N.D. Iowa 2006). Therefore, the court finds, as a matter of law, that defendants owed no duty of care to Owens. This claim will be denied.

In sum, Owens' claims in this case are completely frivolous. He simply cites a variety of state and federal causes of actions but fails to make allegations that defendants committed each of the elements of those actions. Because he has failed to allege a cognizable Sherman Act or state tort law claim, his complaint in C26-3017-LTS will be dismissed.

## *VI. C26-3023-LTS*

In C26-3023-LTS, Owens brings a 42 U.S.C. § 1983 complaint against Iowa Lakes Community College (ILCC), Board of Trustees President Arden Kinnander, President Scott Stokes, Vice President Robert Leifeld, Board of Trustees Vice President Robert M. Jennings and Trustee Janice Lund. C26-3023-LTS, Doc. 1-1 at 2-3. He asserts that defendants violated his procedural and substantive due process rights under the Fourteenth Amendment and retaliated against him in violation of the First Amendment when they expelled him from ILCC. *Id.* at 6-10. For relief, he seeks $250,000 in compensatory damages, a reversal of his expulsion, removal of his disciplinary record and restoration of his enrollment eligibility at ILCC. *Id.* at 11. Owens also filed a motion (C26-3023-LTS, Doc. 2) for a temporary restraining order.

Owens states that as an ILCC student, he disagreed with and challenged coursework by one of his instructors, Dr. Kosse. He asserts that coursework included "ideological subject matter involving abortion, anti-Christian viewpoints, and other controversial positions." C26-3023-LTS, Doc. 1-1 at 6. Owens attaches 100 pages of exhibits to his complaint, including screenshots of communications between Owens and Kosse in which Kosse informed Owens that he censored and deleted a response Owens posted in an on-line, peer review classroom platform as repugnant because it, in part, dismissed white supremacy and stated that women are raped when they don't serve their traditional roles and meet the needs of men. *See, e.g.,* C26-3023-LTS, Doc. 1-2 at 23. The exhibits demonstrate increasingly hostile and inflammatory communications from Owens to Kosse and between Owens and another student. *See, e.g.,* C26-3023-LTS, Doc. 1-3 at 25.

Owens asserts that he was suspended on or about January 9, 2023, and he was "informed that the disciplinary action was a suspension of limited duration, approximately one year." C26-3023-LTS, Doc. 1-1 at 6-7. He states that he "understood that upon completion of the suspension period, he would be eligible to return or reapply." *Id.* He also states that police removed him from where he was living in a semi-truck near

campus. *Id*. Owens asserts that consequently he was forced to leave Iowa and return to Illinois. He states that his "displacement made in-person participation in disciplinary proceedings impossible" but he "nevertheless submitted written evidence, defenses, and arguments via email." *Id*. at 7. He contends that defendants "failed to provide a meaningful opportunity to be heard under these circumstances." *Id.*

Owens states that in the fall of 2023, he reapplied to ILCC. *Id*. However, he received a February 8, 2024, letter that he was expelled and a February 28, 2024, letter upholding the expulsion. *Id*. at 7, 8; *see also* C26-3023-LTS, Doc. 1-3 at 35, 36. Owens states that he appealed the expulsion, but the college president upheld the expulsion on April 9, 2024. C26-3023-LTS, Doc. 1-1 at 8. He attaches that letter, which states that the Board of Trustees will review the recommendation to permanently expel him at a meeting on April 16, 2025, and notes that "[y]our rights and the procedure are set forth in the Iowa Lakes Community College 'Student Handbook.'" C26-3023-LTS, Doc. 1-3 at 37. Owens asserts that, in an April 22, 2024, letter he received on April 24, 2024, the ILCC Board upheld the expulsion "without notice or means to challenge." C26-3023-LTS, Doc. 1-1 at 7, 8. That letter states the Board review included an analysis of his writings with faculty and student body members and that his "conduct violated numerous student conduct policies as stated in the student handbook." C26-3023-LTS, Doc. 1-3 at 38. Owens contends that he was not provided advance notice of a potential expulsion, or a new hearing or opportunity to respond before the expulsion. *Id*. at 7.

With regard to school discipline, the Eighth Circuit has stated:

> Although students do not "shed their constitutional rights … at the school house gate," *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 506, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969), the Supreme Court has observed that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures,…." *New Jersey v. T.L.O.,* 469 U.S. 325, 340, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985). Given the flexibility afforded schools in this area, we must "enter the realm of school discipline with caution," *Stephenson v. Davenport Community School Dist.,* 110 F.3d 1303, 1306 (8th Cir.1997), and we must exercise "care and restraint" in reviewing Westark's

> discretionary decision to expel Woodis from the school's nursing program. *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S. Ct. 266, 21 L. Ed. 2d 228 (1968).

*Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 437–38 (8th Cir. 1998). Courts have concluded that students are entitled to due process in expulsion proceedings, but "[d]ifferent due process requirements exist for disciplinary dismissals and academic dismissals." *Henderson v. Engstrom*, No. CIV 1O-4116, 2012 WL 4009108, at *7 (D.S.D. Sept. 12, 2012).

Owens' claims are untimely. Section 1983 claims are governed by the relevant state's personal injury statute of limitations. *Wycoff v. Menke*, 773 F.2d 983, 984 (8th Cir. 1985). In Iowa, § 1983 actions are subject to a two-year statute-of-limitations. *See* Iowa Code § 614.1(2). Owens states that the "final administrative decision occurred on or about April 22, 2024 (provided on April 24th 2024)." C26-3023-LTS, Doc. 1-1 at 9. He asserts that his claim accrued when he received that decision. *Id.* Owens signed his complaint on May 1, 2026, and the Court received it on May 26, 2026. *Id.* at 1, 12. As such, he filed this case after the expiration of the limitations period.

However, Owens asserts that equitable tolling should excuse his delay. Alternatively, he argues he suffers from continuing harm because the expulsion remains in effect and he still wishes to attend ILCC. *Id.* at 9. Federal law governs when § 1983 cause of action accrues. *Wallace v. Kato,* 549 U.S. 384, 388 (2007). Under federal law, a cause of action accrues when a plaintiff has a complete and present cause of action, *i.e.,* when the plaintiff can file suit and obtain relief. *Id.* (citations omitted). As such, a § 1983 claim accrues "no later than when the plaintiff knows or has reason to know that he has been harmed." *Winston v. Kelly*, No. 5:10CV00180, 2013 WL 593558, at *2 (E.D. Ark. Feb. 15, 2013). As applied to school disciplinary cases, other courts have held that § 1983 expulsion claims accrue when the expulsion is issued. *See, e.g., McNeil v. USC*, No. CV 11-5504, 2011 WL 7063332, at *4 (C.D. Cal. Dec. 19, 2011), *report and recommendation adopted,* No. CV 11-5504, 2012 WL 161807 (C.D. Cal. Jan. 18,

2012) ("At the very latest, plaintiff's section 1983 claims relating to his expulsion and failure to graduate accrued on December 31, 1975, when plaintiff knew both that USC had expelled him, and that his expulsion had prevented him from graduating."); *Dixon v. Univ. of S. California*, No. 221CV05286, 2023 WL 411449, at *5 (C.D. Cal. Jan. 18, 2023), *aff'd,* No. 23-55079, 2024 WL 866028 (9th Cir. Feb. 29, 2024) ("USC asserts that Dixon's claims are barred by the statute of limitations, which began to run on May 12, 2015, when USC completed its investigation and expelled Dixon."); *Tolliver v. Prairie View A&M, Univ.*, No. CV H-18-1192, 2018 WL 4701571, at *2–3 (S.D. Tex. Oct. 1, 2018) (holding that claim accrued when plaintiff knew he had been expelled and his request to overturn the expulsion did not impact the accrual); *Siblerud v. Colorado State Board of Agriculture*, 896 F. Supp. 1506 (D. Colo. 1995) (cause of action for disciplinary dismissal of graduate student accrued on the date the student received a letter from the school informing him of the dismissal).

Owens' argument that his claim did not accrue upon his notification of his expulsion because he suffers from continuing harm from the expulsion is meritless. The continuing violation doctrine applies where there is a pattern of discriminatory acts, the latter of which occurs within the limitations period. In those circumstances, a court may reach back beyond the limitations period to consider other discriminatory acts that would otherwise be untimely. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002). Here, there were no further discriminatory acts. *See, e.g., Datto v. Harrison*, 664 F. Supp. 2d 472 (E.D. Pa. 2009) (rejecting the plaintiff's assertion that a failure to reinstate was part of a continuing violation that would also render timely a challenge to the earlier dismissal); *Doe v. Virginia Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 493 (W.D. Va. 2019) (rejecting continuing violation argument to allow an appeal process to render a challenge to an initial suspension or expulsion timely). "A plaintiff who is feeling the present effects of a past discriminatory action, however, may not rely on the continuing violations theory to avoid a statute of limitations." *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 853 F. Supp. 1118, 1126 (D. Minn. 1994), *aff'd,*

124 F.3d 904 (8th Cir. 1997), *aff'd sub nom. Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999). Rather, "the continuing violation doctrine applies only in cases where there is a continuous unlawful violation, and not to ill effects from the initial violation." *Adams v. Thompson*, No. 22-CV-3047, 2023 WL 4769620, at *5 (D. Minn. July 5, 2023), *report and recommendation adopted,* No. 22-CV-3047, 2023 WL 4768139 (D. Minn. July 26, 2023) (*citing Brown v. Ark. Dept. of Human Servs.*, 452 Fed. App'x 690, 692 (8th Cir. 2011)). Owens does not allege further actions by defendants after the expulsion; he simply alleges ill effects from the expulsion. Thus, the continuing violation doctrine is not applicable in this case, his claims accrued when he was notified of his expulsion and his claims are untimely.

Owens also seeks to toll the statute of limitations. "Equitable tolling is appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands." *Lown v. Brimeyer*, 956 F.2d 780, 782 (8th Cir. 1992). He states that:

> Plaintiff was homeless, displaced across state lines, and lacked stable access to legal resources during the initial incident in 2022, and was not given a chance to be heard or challenge in the switch-up scenario in 2024. . . . Plaintiff nevertheless diligently pursued remedies, appeals, and proper filings. Extraordinary circumstances prevented timely filing, including indigency preventing mailing costs in Early April 2026.

C26-3023-LTS, Doc. 1-1 at 9. However, Owens does not provide any reason why filing a lawsuit was out of his control between April 2024 and early April 2026. Because it was within his control to file a complaint, equitable tolling is not appropriate.

Owens' complaint in case C26-3023-LTS will be dismissed as untimely and his motion (C26-3023-LTS, Doc. 2) for a preliminary injunction will be denied as moot.

## ***VII. ADMONISHMENT***

Owens filed these four cases over a matter of months. As discussed above, all four cases fail to allege a claim for which relief can be granted and at least one was a completely frivolous waste of the court's time and resources. Owens has also filed at

least one other recent case, in another district, that failed to state a claim. *See Owens v. Spoon River Coll.*, No. 1:25-CV-01482, 2026 WL 1962030, at *6 (C.D. Ill. July 7, 2026). Owens, like all litigants, is required to comply with Federal Rule of Civil Procedure 11 which requires that the litigant certify that all "claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Owens is put on notice that if he files further cases, or makes further arguments, that are deemed frivolous on initial review, he will be directed to show cause why he should not be monetarily sanctioned for violating Rule 11.[12]

## *VIII. CONCLUSION*

For the reasons set forth herein:

1. Owens' motions (C26-3002-LTS, Doc. 1; C26-3009-LTS, Doc. 1; C26-3017-LTS, Doc. 1; C26-3023-LTS, Doc. 1) to proceed in forma pauperis are **granted**.

2. The Clerk's office is directed to docket the complaints without the payment of fees: C26-3002-LTS, Doc. 1-1; C26-3009-LTS, Doc. 1-1, C26-3017-LTS, Doc. 1-1 and C26-3023-LTS, Doc. 1-1.

3. After conducting an initial review, Owens' complaint in case C26-3002-LTS is **dismissed** for failure to state a cognizable claim.

4. After conducting an initial review, Owens' complaint in case C26-3009-LTS is **dismissed** for failure to exhaust the administrative remedies.

5. After conducting an initial review, Owens' complaint in case C26-3017-LTS is **dismissed** for failure to state a cognizable claim.

6. After conducting an initial review, Owens' complaint in case C26-3023-LTS is **dismissed** as untimely.

---

[12] Sanctions would start, at minimum, at the cost of the standard civil case filing fee. They would increase proportionally if Owens continues to file frivolous documents with the court.

7. Owens' motion (C26-3023-LTS, Doc. 2) for a temporary restraining order is **denied** as moot.

8. Pursuant to Federal Rule of Appellate Procedure 4(a)(1) parties wishing to appeal a judgment in a civil case must file a notice of appeal "with the district clerk within 30 days after entry of the judgment or order appealed from." The Clerk of Court is directed to send plaintiff four copies of Form 1A from the Appendix of Forms from the Fed. R. of App. P.

**IT IS SO ORDERED** this 1st day of September, 2026.

Leonard T. Strand
United States District Judge